Approved: _____
          MICHAEL LOCKARD/SIDHARDHA KAMARAJU/DAVID DENTON
          Assistant United States Attorneys

Before:   HONORABLE JAMES C. FRANCIS IV
          United States Magistrate Judge
          Southern District of New York

**☐ ORIGINAL**

**17 MAG  2197**

**DOC #___ ___**

- - - - - - - - - - - - - - - - - - X
                :    **SEALED COMPLAINT**

UNITED STATES OF AMERICA    :    Violations of
                            :    50 U.S.C. § 1705;
    - v. -              :    18 U.S.C. § 1349

MEHMET HAKAN ATILLA,      :    COUNTY OF OFFENSE:
                Defendant.    :    NEW YORK
                            :

- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

       JENNIFER A. MCREYNOLDS, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

<u>COUNT ONE</u>
(Conspiracy to Violate the
International Emergency Economic Powers Act)

       1.    From at least in or about 2010, up to and including in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, MEHMET HAKAN ATILLA, the defendant, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701 to 1707, Part 560 of Title 31, Code of Federal Regulations, and Part 561 of Title 31, Code of Federal Regulations.

       2.    It was a part and an object of the conspiracy that MEHMET HAKAN ATILLA, the defendant, and others known and unknown, would and did export, reexport, sell, and supply, and cause to be exported, reexported, sold, and supplied, directly

and indirectly, from the United States, services, to wit,
international financial transactions, to Iran and to the
Government of Iran, without first obtaining the required
approval of the Office of Foreign Assets Control, within the
United States Department of Treasury, in violation of Title 50,
United States Code, Sections 1701 to 1707, and Title 31, Code of
Federal Regulations, Section 560.204.

      3.   It was further a part and an object of the
conspiracy that MEHMET HAKAN ATILLA, the defendant, and others
known and unknown, would and did engage in a transaction that
evaded and avoided, had the purpose of evading and avoiding,
caused a violation of, and attempted to violate one or more of
the prohibitions set forth in Title 31, Code of Federal
Regulations, Part 560, in violation of Title 50, United States
Code, Sections 1701 to 1707, and Title 31, Code of Federal
Regulations, Section 560.203.

  (Title 50, United States Code, Section 1705; Title 31, Code of
     Federal Regulations, Sections 560.203, 560.204, 560.205,
             561.202, & 561.205.)

<u>COUNT TWO</u>
(Conspiracy to Commit Bank Fraud)

      4.   From at least in or about 2010, up to and
including in or about 2015, in the Southern District of New
York, Turkey, the United Arab Emirates, and elsewhere, MEHMET
HAKAN ATILLA, the defendant, and others known and unknown,
knowingly and willfully did combine, conspire, confederate, and
agree together and with each other to commit bank fraud, in
violation of Title 18, United States Code, Section 1344.

      5.   It was a part and an object of the conspiracy
that MEHMET HAKAN ATILLA, the defendant, and others known and
unknown, would and did knowingly execute and attempt to execute
a scheme or artifice to defraud a financial institution, and to
obtain moneys, funds, credits, assets, securities, and other
property owned by and under the custody and control of a
financial institution, by means of false and fraudulent
pretenses, representations, and promises, in violation of Title
18, United States Code, Section 1344.

      (Title 18, United States Code, Section 1349.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

6.    I am a Special Agent with the FBI, currently assigned to the FBI's Counterintelligence Division.  This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals.  Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**Background**

7.    Based on my review of, among other things, publicly available information on the website LinkedIn and of a business card provided by MEHMET HAKAN ATILLA, the defendant, at an inspection by United States Customs and Border Protection on or about March 23, 2017, I have learned that ATILLA is the Deputy General Manager of International Banking at a financial institution headquartered in Istanbul, Turkey ("Turkish Bank-1").  ATILLA has served in that capacity since on or about November 11, 2011.

8.    Based on my review of, among other things, publicly available information, including financial documentation, I have learned that Turkish Bank-1 is a major financial institution that maintains correspondent banking accounts with several large U.S. banks located in the Southern District of New York and elsewhere.  Through those accounts, Turkish Bank-1 is able make and receive payments in U.S. dollars on behalf of its customers.  Based on my training and experience, I understand that the normal method for processing U.S. dollar payments is as follows: When a Turkish Bank-1 customer located in Turkey wishes to make a payment denominated in U.S. dollars to a company in a third country, Turkish Bank-1 debits its customer's account, then transmits the payment instruction to its correspondent U.S. bank, who in turn debits Turkish Bank-1's U.S. dollar correspondent account with the U.S. bank, while simultaneously transmitting those U.S. dollars from the account at the U.S. bank to the correspondent account of the recipient's bank in the third country.

**The Zarrab Scheme**

9.    Based on my participation in the investigation, I have become familiar with a scheme to facilitate illegal access to the United States financial system by entities affiliated with the Government of Iran, including Iran's Islamic Revolutionary Guard Corps ("IRGC"), and that have been sanctioned under the Iranian Transactions and Sanctions Regulations (the "ITSR"), 31 CFR Part 560, the Iranian Financial Sanctions Regulations ("IFSR"), 31 C.F.R. Part 561, and the Weapons of Mass Destruction Proliferators Sanctions Regulations ("WMD Sanctions"), 31 C.F.R. Part 544.[1]  The scheme was orchestrated by dual-Iranian and -Turkish citizen Reza Zarrab, a/k/a "Riza Sarraf," and others (the "Zarrab Scheme").

a.    The Zarrab Scheme allowed the Government of Iran and sanctioned entities to circumvent the prohibition on their access to the United States financial system by using front companies located in third countries like Turkey and the United Arab Emirates ("UAE"), the creation of falsified invoices, and the transmission of false and/or incomplete wire payment instructions.  Through these methods, the co-conspirators in the Zarrab Scheme concealed from U.S. financial institutions that international financial transfers appearing to be on behalf of Turkish and Emirati counterparties were, in fact, on behalf of and for the benefit of the Government of Iran and sanctioned entities.  The co-conspirators caused U.S. financial institutions to violate U.S. sanctions by causing them unknowingly to conduct these international financial transactions and export financial services to the Government of Iran and to agents or affiliates of the IRGC.  The co-conspirators caused U.S. banks to conduct numerous unlawful transactions in U.S. dollars through correspondent bank accounts located in the Southern District of New York and elsewhere.

b.    Reza Zarrab, a/k/a "Riza Sarraf," Mohammad Zarrab, a/k/a "Can Sarraf," a/k/a "Kartalmsd," Camelia Jamshidy, a/k/a "Kamelia Jamshidy," and Hossein Najafzadeh, were charged in an indictment under docket number S2 15 Cr. 867 (RMB) with

---

[1] Pursuant to the Joint Comprehensive Plan of Action ("JCPOA") between the United States, Iran, and five other countries regarding Iran's nuclear program, the United States committed to refraining from the imposition of certain secondary sanctions under the IFSR as of January 16, 2016 ("Implementation Day.")

their alleged involvement in the Zarrab Scheme.[2]  This indictment is attached as Exhibit A to this Complaint and is incorporated by reference as if set forth fully herein.

10.   The charges alleged against MEHMET HAKAN ATILLA, the defendant, in this Complaint arise out of ATILLA's participation in the Zarrab Scheme described above. Specifically, ATILLA, Zarrab, and others protected and hid Zarrab's ability to provide access to international financial networks, including U.S. financial institutions, to the Government of Iran, Iranian entities, and entities identified by OFAC as Specially Designated Nationals ("SDNs").  They did so by, among other things, using Turkish Bank-1 to engage in transactions that violated U.S. sanctions against Iran.  In particular, they  took steps to protect and hide Zarrab's ability to supply currency and gold to the Government of Iran, Iranian entities, and SDNs using Turkish Bank-1 without subjecting Turkish Bank-1 to U.S. sanctions.  As part of their conduct in furtherance of the Zarrab Scheme, as described in more detail below, ATILLA, Zarrab, and others conspired to create and use false and fraudulent documents to disguise prohibited transactions for Iran and make those transactions appear as transactions involving food and thus falling within humanitarian exceptions to the sanctions regime.

### Statutory Background

11.   The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1706, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

12.   Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

---

[2] Zarrab was arrested on March 19, 2016, and is scheduled to begin trial on August 21, 2017.

13.  On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (collectively, the "Executive Orders"), and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.  The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013, the Iranian Transactions and Sanctions Regulations, the "ITSR") implementing the sanctions imposed by the Executive Orders.

14.  The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibit, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC").

15.  The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.  31 C.F.R. § 560.203.

16.  The ITSR contain certain "general licenses" authorizing categories of transactions by U.S. persons without the need to apply to OFAC for specific licenses.  For example, the ITSR contain an exemption to the prohibition on providing goods and services to Iran or individuals located in Iran that allows U.S. persons to donate certain items, such as food and medicine, for humanitarian purposes.  See 31 C.F.R. § 560.210. Similarly, the IFSR allow foreign financial institutions to conduct or facilitate transactions for the sale of food, among other things, to Iran.  See 31 C.F.R. § 561.203.  Note 2 to section 561.203 provides that: "[F]unds owed to Iran . . . may be used for the purchase and export to Iran of agricultural commodities, food, medicine, or medical devices regardless of the country from which such goods are purchased and regardless of where such goods originate, and payment from the funds for such goods may be made to exporters in countries other than the

country with primary jurisdiction over the foreign financial institution holding the funds."

17.  The export or supply of gold to Iran or Iranian entities, however, subjected foreign financial institutions to U.S. sanctions, including being blocked from having U.S. correspondent bank accounts.  On July 30, 2012, the President authorized, among other things, the Secretary of the Treasury to impose sanctions on persons who have "materially assisted, sponsored, or provided financial, material, or technological support for . . . the purchase or acquisition of U.S. bank notes or precious metals by the Government of Iran."  Exec. Order 13622, 77 Fed. Reg. 45897 (Jul. 30, 2010). On January 2, 2013, the Iranian Freedom and Counterproliferation Act ("IFCA"), codified at 22 U.S.C. § 8804(a)(1)(A), required the imposition of sanctions on any person who knowingly "sells, supplies, or transfers, directly or indirectly, to or from Iran, a precious metal."  On June 3, 2013, the President implemented, among other things, the IFCA's prohibition on dealings in precious metals on behalf of Iran.[3]  Exec. Order 13645, 78 Fed. Reg. 33945 (June 3, 2013).

### Fraudulent Food Exports to Conduct
### Financial Transactions For Iran Through Turkish Bank-1

18.  Based on my participation in the investigation, conversations with other law enforcement agents involved in the investigation and others, and my review of materials obtained in the course of the investigation -- including recordings of conversations and transcripts of recordings[4] -- I have learned, among other things, that:

---

[3] On January 16, 2016, Executive Order 13716 revoked the prohibitions of Executive Orders 13622 and 13645, pursuant to the JCPOA.

[4] The conversations described herein occurred principally in Turkish.  The descriptions of these conversations are based on preliminary English translations and summaries of these conversations.  Because these translations and summaries are partial and preliminary, they are subject to revision as more complete translations are obtained and as additional information is obtained.  In addition, based on my discussions with a Turkish interpreter who was reviewed both audio recordings of calls described in this Complaint with the assistance of a Turkish interpreter and publicly available recordings of MEHMET HAKAN ATILLA, the defendant, on the website YouTube, as well as

        a.    On or about March 26, 2013, Zarrab and a co-conspirator not named as a defendant herein ("CC-1") spoke by telephone.  During that call, which was recorded, Zarrab and CC-1 discussed a conversation that Zarrab just had with a second co-conspirator not named herein ("CC-2"), who was MEHMET HAKAN ATILLA's supervisor, about the fact that "they're gonna stop the gold in about a month and a half" and that "he constantly said do food, I'll extend it for two or three months but he keeps saying do food."  Zarrab went on, in part: "He [CC-2] says to send it from Dubai to Iran."  Zarrab later said, "He says that wherever you can provide a document from, do it."  Based on my training and experience and my participation in the investigation, I understand that this conversation shows Zarrab's, CC-1's, and CC-2's awareness of additional U.S. sanctions against foreign banks supplying gold to the Government of Iran and Iranian entities, which were expected to be implemented in the summer of 2013 as a result of the IFCA.  The conversation reflects an agreement to continue conducting transactions for Iran, but to disguise them as food purchases using false documents in order to evade sanctions.

        b.    In or about April 2013, ATILLA and Zarrab spoke by telephone.  During that call, which was recorded, ATILLA and Zarrab discussed, in sum and substance, Zarrab's role in processing purported food transactions for the benefit of Iran.  Zarrab explained to ATILLA, in sum and substance, that Zarrab would receive payment from Iranian customers which he would transmit to Dubai-based companies in dollars.  Zarrab explained that "we sell it . . . in dollars, . . . we'll send the amount to the company there."  In addition, Zarrab stated, in sum and substance, that the processing of these transactions would be handled in the same manner as the processing of transactions to convert dollars into gold for the benefit of Iran that Zarrab, ATILLA, and others had previously arranged.

        c.    Also in or about April 2013, Zarrab spoke by telephone with CC-2.  During that call, which was recorded, Zarrab and CC-2 discussed, in sum and substance, obtaining a document from the Government of Iran indicating that Zarrab's

---

the fact that ATILLA is either referred to or introduces himself by name at the beginning of several of the calls described in this Complaint, it appears that the voice of the individual recorded on the communications described herein is in fact ATILLA.

companies were the only companies authorized to conduct food transactions on behalf of the Government of Iran in Turkey.

       d.   On or about July 2, 2013, Zarrab and CC-1 spoke by telephone. During that call, which was recorded, Zarrab and CC-1 discussed, in sum and substance, the fact that Turkish Bank-1 had asked that Zarrab and his associates provide bills of lading[5] to support the purported food transactions being processed by Turkish Bank-1. Zarrab indicated that he would resolve the issue by "speak[ing] with Hakan Atilla." Based on my participation in this investigation and the context of this communication, I understand this to be a reference to ATILLA.

       e.   Also on or about July 2, 2013, shortly after the call described above in paragraph 18(d), Zarrab and ATILLA spoke by telephone. During that call, which was recorded, Zarrab spoke with an administrative assistant and asked to be transferred to ATILLA. Zarrab and ATILLA then discussed the bills of lading requested by Turkish Bank-1. Zarrab explained his purported inability to provide bills of lading because he used small, five-ton wooden ships for transport between Dubai and Iran that would not provide bills of lading. ATILLA expressed his concern about this explanation: "I'm thinking it would be slightly difficult to carry [goods] weighing 140-150 thousand tons in things that carry five thousand tons." ATILLA later noted, "that's not physically possible." Zarrab explained that, while he could not provide bills of lading, he could provide Customs documents: "The document is being prepared by the government. Customs. Dubai Customs is arranging which ship it will go with, how much, and what's being carried. And also there's the Dubai seal on margin." ATILLA agreed: "You can get those documents? Then give us those documents and I will look at the bill of lading issue later." Zarrab acknowledged that he had made an error by making the transfer too large: "Hakan, we made an error there. We should have sent it in five million." After further discussion, Zarrab agreed to also send bills of lading, despite having earlier denied being able to obtain them.

       f.   Later on or about July 2, 2013, Zarrab and ATILLA spoke again by telephone. During that call, which was recorded, Zarrab and ATILLA again discussed, in sum and substance, the false bills of lading. ATILLA stated that he was aware that: "in the independent auditing of the goods, they want to be able to determine that the product is food. . . that's why

---

[5] A bill of lading is a shipping document that reflects the type, quantity, destination, and carrier of goods and commodities.

they want, it's verification."[6]  ATILLA further stated that "in the transmitted document, the country of origin of the product, the wheat's origin is Dubai . . .  I mean, it's impossible for wheat to be originating from Dubai."  Zarrab acknowledged, "Ok."

g.    Also on or about July 2, 2013, following the conversation described above in Paragraph 18(f), Zarrab and CC-1 spoke by telephone.  During that call, which was recorded, Zarrab stated in part: "Do you know what's stirring the pot? That document you turned in, they wrote Dubai as the origin of the wheat.  The man says wheat doesn't grow in Dubai."

h.    In or about the evening of July 2, 2013, ATILLA and CC-2 spoke by telephone.  During that call, which was recorded, ATILLA described, in sum and substance, his earlier conversation with Zarrab regarding false supporting documentation.  ATILLA informed CC-2 that Zarrab had stated that he [Zarrab] could not provide bills of lading, and further stated, in part: "you're talking about 150 thousand tons, I said.  I think I said, you're not transporting it like that. . ."  CC-2 laughed in response.  ATILLA went on to explain, in part, that the problem was caused because Zarrab tried to transfer too large an amount of money at once: "[H]e understood that the large number was an error to himself I think.  He might be thinking the number should be smaller."  CC-2 responded that: "the numbers looked big to me as well. I mean, five to six million is enough for each party."  ATILLA and CC-2 further discussed, in sum and substance, the rate of commission that would be charged by Turkish Bank-1 to process the transactions for Iran in connection with the Zarrab Scheme.

i.    The following day, on or about July 3, 2013, Zarrab and CC-2 spoke by telephone.  During that call, which was recorded, CC-2 reiterated that the documents were "written incorrectly . . . when that document says Dubai, then it creates question marks about that document's trustworthiness. . . .

---

[6] Based on my training and experience and my participation in this investigation, I have learned, in sum and substance, that both U.S. regulators, such as OFAC, and U.S. banks processing correspondent transactions in U.S. dollars frequently request bills of lading or other supporting documents to demonstrate the legitimate purpose of a financial transaction.  There is probable cause to believe that ATILLA's reference to "the independent auditing of goods" includes this review of documents by U.S. entities in determining whether or not to authorize transactions in U.S. dollars.

[W]hen you say I'm carrying it with small vessels, it didn't correlate with those numbers." Zarrab acknowledged that, "yes, that's our shortcoming."

j.    Also on or about July 3, 2013, after the conversation described above in Paragraph 18(i), Zarrab and CC-1 spoke by telephone. During that call, which was recorded, Zarrab stated that "that thing you guys wrote that the origin as Dubai, well, they became suspicious of that declaration." Zarrab instructed CC-1 to submit new documents, instructing him to "make it decent, not hand written, have it printed. . . . The man on the phone said to not to reveal my shortcomings."

k.    On or about July 9, 2013, Zarrab and CC-1 spoke by telephone. During that call, which was recorded, CC-1 informed Zarrab, in sum and substance, about a problem with a proposed transaction, specifically that Turkish Bank-1 "won't enter it." Zarrab instructed CC-1, "Don't send it yet, wait for Hakan Atilla to call later. . . That way they would understand that the insider news came."

l.    On or about July 9, 2013, ATILLA and Zarrab spoke by telephone. During that call, which was recorded, ATILLA and Zarrab discussed, in sum and substance, the false supporting documents submitted in connection with Zarrab's transfers. ATILLA reiterated, "Some of these ships are very large. There are ships that carry 50,000, 80,000, 90,000 tons of goods. These are not small ships. I beg you to ask our colleagues to take a look at the tonnage." Zarrab acceded: "Of course. Should they only look at the larger ships?" ATILLA warned of the even greater risks of documents identifying smaller ships:

> They should look at the small ones, too. On the larger ships, it's possible to give a bill of lading. On smaller ships, that can carry 13,000, 14,000, the goods are 20,000. That brings attention to these ships. You need to check that out. There are larger goods on the smaller tonnage ships.

Zarrab asked: "Should I do anything about them?" ATILLA instructed: "They should pay attention that the tonnage should match." ATILLA gave these instructions despite having been earlier informed by Zarrab that the documents he [Zarrab] provided were prepared by Dubai Customs.

11

   m. On or about July 9, 2013, after the call described above in Paragraph 18(l), Zarrab and CC-1 spoke by telephone.  During the intercepted call, Zarrab stated, in part, "[T]hese guys loaded 20 thousand tons on a vessel with a capacity of 13 thousand tons; he says to pay attention to these, that's all.  The man is just openly saying that don't stick it into our eyes, that's it, what else could he say?"  CC-1 responded, "Thank you, God bless him, what else can I say?"

   n. Accordingly, based on my participation in this investigation, I have learned that participants in the Zarrab Scheme, including ATILLA, Zarrab, and others known and unknown, conspired to falsify documents in order to process transactions by fraudulently representing to U.S. correspondent banks, including U.S. correspondent banks used by Turkish Bank-1, that payments being made on behalf of Iran were part of exempted purchases of food by the Government of Iran or Iranian entities, in order to evade U.S. sanctions that prohibit the true nature of these transactions.

   WHEREFORE, the deponent respectfully requests that a warrant issue for the arrest of MEHMET HAKAN ATILLA, the defendant, and that he be imprisoned or bailed, as the case may be.

          Jennifer A. McReynolds
          Special Agent, FBI

Sworn to before me this
27th day of March, 2017

HONORABLE JAMES C. FRANCIS IV
United States Magistrate Judge
Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

▯ ORIGINAL

- - - - - - - - - - - - - - - - - -x
                         :

UNITED STATES OF AMERICA       :     **SUPERSEDING INDICTMENT**

       - v. -             :     S2 15 Cr. 867 (RMB)

                         :

REZA ZARRAB,
     a/k/a "Riza Sarraf,"     :
MOHAMMAD ZARRAB,
     a/k/a "Can Sarraf,"      :
     a/k/a "Kartalmsd,"
CAMELIA JAMSHIDY,          :
     a/k/a "Kamelia Jamshidy," and
HOSSEIN NAJAFZADEH,       :

            Defendants.    :

                         :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: **NOV 0 7 2016**

### COUNT ONE

(Conspiracy to Defraud the United States

     The Grand Jury charges:

### BACKGROUND

### The International Emergency Economic Powers Act

       1.     The International Emergency Economic Powers Act

("IEEPA"), codified at Title 50, United States Code, Sections

1701-1706, confers upon the President authority to deal with

unusual and extraordinary threats to the national security and

foreign policy of the United States.  Section 1705 provides, in

part, that "[i]t shall be unlawful for a person to violate,

attempt to violate, conspire to violate, or cause a violation of

any license, order, regulation, or prohibition issued under this

title."  50 U.S.C. § 1705(a).

    2.    Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

    3.    On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 (collectively, the "Executive Orders"), and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.  The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013, the Iranian Transactions and Sanctions Regulations, the "ITSR") implementing the sanctions imposed by the Executive Orders.

    4.    The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibits, among other things, the exportation,

reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC").

5.     The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.   31 C.F.R. § 560.203.

6.     Appendix A to the ITSR contained a list of persons determined to be the Government of Iran.   At all times relevant to this Indictment, Bank Mellat was an Iranian state-owned bank on the list in Appendix A.   At all times relevant to this Indictment, the National Iranian Oil Company ("NIOC") was an Iranian Oil Company on the list in Appendix A.   At all times relevant to this Indictment, Naftiran Intertrade Company Ltd. ("NICO"), an Iranian company located in the United Kingdom and Naftiran Intertrade Company Sarl ("NICO Sarl"), an Iranian company located in Switzerland, were on the list in Appendix A.

3

7.   Bank Mellat and all of its branches and
subsidiaries were designated by OFAC on or about October 25,
2007, as Specially Designated Nationals ("SDNs") under the ITSR,
the Iranian Financial Sanctions Regulations ("IFSR"), 31 C.F.R.
Part 561, and the Weapons of Mass Destruction Proliferators
Sanctions Regulations ("WMD Sanctions"), 31 C.F.R. Part 544.
Mellat Exchange Company ("Mellat Exchange") was a money services
business owned and controlled by Bank Mellat.   At all times
relevant to this Indictment, Bank Mellat was an SDN.

8.   On or about July 12, 2012, OFAC designated Hong
Kong Intertrade Company ("HKICO") as an SDN pursuant to the
ITSR.   OFAC further identified NIOC as an agent or affiliate of
Iran's Islamic Revolutionary Guard Corp ("IRGC") pursuant to
Executive Order 13599 on or about September 24, 2012, and
designated Seifollah Jashnsaz, chairman of NICO, NICO Sarl, and
HKICO, as an SDN under the WMD Sanctions on or about May 23,
2012.   At all times relevant to this Indictment after on or
about July 12, 2012, HKICKO was an SDN. At all times relevant to
this Indictment after May 23, 2012, Jashnsaz was an SDN.   At all
times relevant to this Indictment after September 24, 2012, NIOC
was identified as an agent or affiliate of the IRGC.

9.   On or about October 12, 2011, OFAC designated
Mahan Air as an SDN pursuant to Executive Order 13224 for

4

providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF"). According to OFAC, Mahan Air, based in Tehran, provided transportation, funds transfers and personnel travel services to the IRGC-QF, including by providing travel services to IRGC-QF personnel flown to and from Iran and Syria for military training, facilitating the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel, facilitated IRGC-QF arms shipments, and received funds for the procurement of controlled goods by the IRGC-QF.  Further according to OFAC, Mahan Air also provided transportation services to Hizballah, a Lebanon-based designated Foreign Terrorist Organization, and has transported personnel, weapons and goods on behalf of Hizballah and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hizballah.

### The Defendants

10.  At all times relevant to this Indictment, REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, owned and operated a network of companies located in Turkey and in the United Arab Emirates, including a group of companies under Royal Holding A.S. ("Royal Holding"), a holding company in Turkey, Durak Doviz

5

Exchange, a money services business in Turkey, and Al Nafees Exchange LLC ("Al Nafees Exchange"), a money services business in the United Arab Emirates.  The Royal Holding group of entities includes Royal Emerald Investments, among others.

11.  At all times relevant to this Indictment, MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," the defendant, owned and operated a network of companies located in Turkey and in the United Arab Emirates, including Flash Doviz Exchange ("Flash Doviz"), a money services business in Turkey; Hanedan General Trading LLC ("Hanedan General Trading"), a company in the UAE, among others.

12.  At all times relevant to this Indictment, CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," the defendant, was an employee of REZA ZARRAB, a/k/a "Riza Sarraf," the defendant, at Royal Holding and related entities.

13.  At all times relevant to this Indictment, HOSSEIN NAJAFZADEH, the defendant, was a senior officer at Mellat Exchange.

14.  At all times relevant to this Indictment, REZA ZARRAB, a/k/a "Riza Sarraf," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADHEH, the defendants, and others assisted Iranian individuals and companies, including Bank Mellat, Mellat Exchange, NIOC, HKNICO, and others, to evade U.S.

sanctions by conducting international financial transactions using Turkish and Emirati companies on behalf of and for the benefit of these Iranian individuals and entities in order to conceal from U.S. banks and others that services were being provided to Iran, to the Government of Iran, and to agents or affiliates of the IRGC in violation of the IEEPA, the ITSR, and the IFSR.

### Statutory Allegations

15.   From at least in or about 2010, up to and including in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, REZA ZARRAB, a/k/a "Riza Sarraf," MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to defraud the United States and an agency thereof, to wit, to impair, impede, and obstruct the lawful and legitimate governmental functions and operations of the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") in the enforcement of economic sanctions laws and regulations administered by that agency.

## Overt Acts

16.   In furtherance of the conspiracy and to effect
the illegal object thereof, REZA ZARRAB, a/k/a "Riza Sarraf"
("ZARRAB"), MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a
"Kartalmsd" ("MOHAMMAD ZARRAB"), CAMELIA JAMSHIDY, a/k/a
"Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and
others committed the following overt acts, among others:

a.   On or about December 3, 2011, ZARRAB and
NAJAFZADEH received an email attaching a draft letter in Farsi
addressed to the General Manager of the Central Bank of Iran and
prepared for ZARRAB's signature, stating in part:

> The role that the Supreme Leader [the
> Ayatollah Khamenei] and the esteemed
> officials and employees of Markazi Bank [the
> Central Bank of Iran] play against the
> sanctions, wisely neutralizes the sanctions
> and even turns them into opportunities by
> using specialized methods.  It is no secret
> that the trend is moving towards
> intensifying and increasing the sanctions,
> and since the wise leader of the Islamic
> Revolution of Iran has announced this to be
> the year of the Economic Jihad, the Zarrab
> family, which has had half a century of
> experience in foreign exchange, while
> establishing branches in Turkey, United Arab
> Emirates, Russia, and Azerbaijan, considers
> it to be our national and moral duty to
> declare our willingness to participate in
> any kind of cooperation in order to
> implement monetary and foreign exchange
> anti-sanction policies . . . .
>
> Hoping that the efforts and cooperation of
> the zealous children of Islamic Iran will

8

result in an upward increase in the progress
of our dear nation in all international and
financial arenas.

### Transactions for Mellat Exchange

b.   On or about January 26, 2011, a co-
conspirator not named as a defendant herein ("CC-1"), an
employee of Mellat Exchange, described in paragraph 7 above,
sent an email to a second co-conspirator not named as a
defendant herein ("CC-2"), an employee of Al Nafees Exchange,
described in paragraph 9 above, with instructions for Al Nafees
Exchange to make international financial transfers on behalf of
Mellat Exchange.   Included in the instructions was a payment in
the amount of approximately $953,288.85 to a company located in
Canada ("Canadian Company-1") described as "transfer by MAPNA."
MAPNA is a reference to MAPNA Group, an Iranian construction and
power plant company.

c.   On or about January 27, 2011, Royal Emerald
Investments, a co-conspirator not named as a defendant herein,
caused an international wire transfer from the UAE to Canadian
Company-1 in the amount of approximately $953,289, which was
processed by a United States bank ("U.S. Bank-1").   The wire
transfer information provided to U.S. Bank-1 purported that the
payment was related to fire equipment, but made no mention of
MAPNA Group.

9

d.    On or about February 28, 2011, CC-1 of Mellat Exchange sent an email to CC-2 of Al Nafees Exchange with instructions for making several international financial transfers, including four transfers in United States currency, on behalf of Mellat Exchange. Included in the instructions was a payment in the amount of approximately $76,950 to a company located in China ("Chinese Company-1"), identifying the "Intermediary Bank" for the transaction as a bank located in the United States ("U.S. Bank-2").

e.    On or about March 1, 2011, CC-1 sent an email to ZARRAB and to a co-conspirator not named as a defendant herein ("CC-3"), an employee of Royal Holding, attaching a list of the four U.S.-currency payment instructions for Mellat Exchange described in paragraph 16(c) above.

f.    On or about March 9, 2011, CC-1 of Mellat Exchange sent an email to CC-2 of Al Nafees Exchange with instructions for making several international financial transfers in United States currency on behalf of Mellat Exchange. Included in the instructions was a payment in the amount of approximately $9,225 to a company located in Hong Kong ("Hong Kong Company-1").

g.    On or about May 24, 2011, CC-1 of Mellat Exchange sent an email to ZARRAB, JAMSHIDY, and CC-3 of Royal

10

Holdings with the subject line, in Farsi, "very very
urgent!!!!!!!!!!!" Attached to the email were (1) a portion of a
SWIFT message addressed to the attention of "OFAC/Compliance
Unit" indicating that an international wire transfer in the
amount of approximately €3,711,365 had been stopped by U.S.
Bank-1 because of global sanctions; (2) a statement that the
payment related to services provided in connection with
development of a gas field in Iran; and (3) a letter from Mellat
Exchange to ZARRAB stating in part, in Farsi:

> Based on the results of the continuous
> follow-ups regarding the above transfer, and
> your suggestion regarding communication with
> the OFAC agency in Turkey regarding
> facilitating transfers or returns thereof,
> the information received from the credit
> applicant is reflected exactly for follow up
> and appropriate action.

h.    On or about May 31, 2011, JAMSHIDY sent an
email to CC-2 of Al Nafees Exchange attaching a letter from
Mellat Exchange, signed by NAJAFZADEH, to Al Nafees Exchange
requesting the delivery of approximately $30 million in U.S.
currency to Mellat Exchange in Tehran, Iran.

i.    On or about June 1, 2011, CC-1 of Mellat
Exchange sent an email to ZARRAB with the subject line, in
Farsi, "very urgent" and attaching, among other things, (1) a
portion of a SWIFT message noting that a payment in the amount
of approximately $9,225 had been blocked by a United States bank

11

("U.S. Bank-3") "pursuant to the sanctions imposed by the U.S.

Gov Dept. of Treasury OFAC"; (2) a letter from Hong Kong

Company-1's bank advising that a payment to Hong Kong Company-1

from Asi Kiymetli Madenler Turizm Otom in the amount of

approximately $9,200 had been blocked by U.S. Bank-3 because of

OFAC; (3) a portion of a second SWIFT message noting that

payment of a second international transfer to Hong Kong Company-

1 in the amount of approximately $35,000 had been blocked by a

United States bank ("U.S. Bank-4") as a result of OFAC

sanctions; (4) a letter from Mellat Exchange dated May 15, 2011,

to a relative of ZARRAB's at Al Nafees Exchange, signed by

NAJAFZADEH, concerning the two blocked payments; and (5) a

letter from Mellat Exchange dated June 1, 2011, to Durak Doviz

Exchange, signed by NAJAFZADEH, concerning the two payments

"through the Nafees Exchange," which stated in part, in Farsi:

> [T]he above amounts were blocked by OFAC,
> and despite repeated follow-ups to execute
> these transfers by providing all necessary
> documents, unfortunately, the transfers have
> not been executed and deposited in the
> beneficiary's account. Therefore, despite
> the lack of communication with you regarding
> the covered topic, and only with regard to
> your excellent achievements regarding
> similar prior cases, it is requested:
> Regarding the passage of more than 2 months,
> and the lack of any results from the follow-
> ups of Nafiss Exchange, please arrange that
> with your guidance this case can be closed.

## Transactions for the Iranian Ministry of Oil,
## NIOC, NICO, and HKNICO

j.    On or about January 7, 2013, ZARRAB sent an email to a co-conspirator not named as a defendant herein ("CC-4"), an employee of Royal Holding, attaching instructions for an international financial transfer from Turkish company ECB Kuyumculuk Ic Vedis Sanayi Ticaret Limited Sirketi in the amount of approximately $600,000 to an energy company located in Turkmenistan ("Turkmeni Company-1").

k.    On or about January 16, 2013, ZARRAB sent an email to a co-conspirator not named as a defendant herein ("CC-5") attaching a SWIFT message for a payment in the amount of approximately $1,000,000 from Gunes General Trading LLC, a company located in the U.A.E., to Turkmeni Company-1.

l.    On or about January 16, 2013, Gunes General Trading LLC, a co-conspirator not named as a defendant herein, caused an international wire transfer from the U.A.E. to Turkmeni Company-1 in the amount of approximately $999,907, which was processed by a United States bank ("U.S. Bank-5").

m.    On or about November 11, 2013, a co-conspirator not named as a defendant herein ("CC-6") sent an email to ZARRAB attaching (1) a letter from HKICO, signed by Seifollah Jashnsaz and stamped "CONFIDENTIAL," addressed to HKICO's bank concerning an approximately €100 million transfer

13

to HKICO's account; (2) a letter from NIOC concerning an

international financial transfer; and (3) a letter from Turkmeni

Company-1 dated May 30, 2013, addressed to the Deputy Minister

of Iran's Oil Ministry, instructing that payment to Turkmeni

Company-1 be made in U.S. currency.

### Transactions for Mahan Air

n.    On or about October 13, 2011, a co-

conspirator not named as a defendant herein ("CC-7"), an

individual affiliated with Mahan Air's office in Dubai, received

an email from a representative of Mahan Air with the subject

"IMPORTANT !! -- MAHAN AIR has been OFAC listed from US Treasury

Department" and including, among other things, a statement that

a bank had advised that "all transactions to/from Mahan Air will

be rejected as per sanctions policy, following the addition of

Mahan Air to the OFAC list[.]"

o.    On or about December 18, 2013, CC-2 received

an email from an employee of Al Nafees Exchange with the subject

line: "ASCOT" and attaching electronic copies of (1) license

information for Ascot General Trading, a Dubai company, showing

CC-7 as the licensee and manager, on which was a handwritten

note in Farsi referencing "Mahan" and the name of an officer in

Mahan Air's Dubai office, a co-conspirator not named as a

defendant herein ("CC-8"); (2) pages from the passport of CC-7;

14

(3) an Al Nafees Exchange account signature card for Ascot General Trading showing CC-7 as the account signatory; and (4) a letter dated December 17, 2013, on Ascot General Trading letterhead, signed by CC-7 and addressed to Al Nafees Exchange, directing a transfer from Ascot General Trading's account to a beneficiary with an account at an Iranian bank.

p.    On or about January 19, 2015, CC-7 received an email from a money services business concerning a returned wire transfer and including a portion of a SWIFT message stating, among other things, "ORIGINATOR IN OFAC SANCTIONLIST."

q.    On or about June 25, 2015, MOHAMMAD ZARRAB received an email from an employee of Al Nafees Exchange attaching a copy of an Al Nafees Exchange Payment Order for Flash Doviz, MOHAMMAD ZARRAB's company, concerning a payment of $1,180,238.00 (U.S. dollars) and a second payment of €129,901.00 from Ascot General Trading to Flash Doviz Exchange "FOR MAHAN" and naming CC-8.  A handwritten note on the payment order, in Farsi, read in part: "Please deposit the above amounts in the Mahan account and show us the transfer slips."

r.    On or about July 6, 2015, MOHAMMAD ZARRAB received an email from an employee of Al Nafees Exchange attaching electronic copies of (1) an Al Nafees Exchange Payment Order for Flash Doviz concerning a payment of approximately

15

€570,613.00 from Ascot General Trading to Flash Doviz Exchange
"FOR MAHAN" and naming CC-8, with a handwritten note in Farsi
that read, in part: "To be deposited into your Mahan account;"
and (2) four Fund Transfer Request Forms concerning requested
payments totaling approximately €560,613 to recipients in
Austria, Greece, Singapore, and Germany, each bearing an Ascot
General Trading stamp.

        s.    On or about July 7 and July 8, 2015,
MOHAMMAD ZARRAB sent CC-2 approximately four emails attaching
electronic copies of wire transfer records concerning payments
corresponding to the July 6, 2015, Fund Transfer Requests
described in paragraph 16(r) above.  The originators on the wire
transfers were two Turkish companies ("Turkish Company-1" and
"Turkish Company-2").

        t.    On or about July 9, 2015, an officer with
Mahan Air, a co-conspirator not named as a defendant herein
("CC-9"), received two emails from an employee of Al Nafees
Exchange attaching two of the wire transfer records described in
paragraph 16(s) above.

        u.    On or about July 13, 2015, MOHAMMAD ZARRAB
sent an email to an employee of Al Nafees Exchange attaching a
SWIFT message concerning a transfer of $324,690 from Turkish
Company-1 to a company in Malaysia ("Malaysian Company-1").  The

16

SWIFT message record reflected that the message had been sent
from a bank in Turkey to a United States bank ("U.S. Bank-6") in
"New York, NY, United States of America," indicating that the
payment would be transferred through a correspondent account
held at Bank-6.

v.    On or about July 21, 2015, MOHAMMAD ZARRAB
received an email from an employee of Al Nafees Exchange with
the subject: "tt's" -- a reference to telegraphic transfers, or
wire transfers.  Attached to the email was an Al Nafees Exchange
Payment Order concerning payments from Ascot General Trading to
Flash Doviz Exchange for Mahan Air in the amounts of €363,971,
$100,000, and €298,984, and an additional $116,385.00 transfer
to a named individual.  A handwritten note in Farsi on the
payment order read, in part, "Put in the Mahan account."  Also
attached were four Fund Transfer Request Forms, bearing an Ascot
General Trading stamp, concerning payments (1) to a company in
Hong Kong ("Hong Kong Company-2") for $100,000, and (2) an
entity with an address in Belize but having an account in Latvia
and entities located in Greece, France, and Belgium.

w.    On or about July 22, 2015, an email was sent
by an employee of MOHAMMAD ZARRAB, a co-conspirator not named as
a defendant herein ("CC-10"), to an employee of Al Nafees
Exchange attaching a copy of a Wire Transfer Send Money Receipt

17

from a money services business in Dubai reflecting a wire transfer of $100,000 from Hanedan General Trading to Hong Kong Company-2.

        x.   On or about July 23, 2015, MOHAMMAD ZARRAB received an email from an employee of Al Nafees Exchange attaching electronic copies of (1) an Al Nafees Exchange Payment Order, with a handwritten note in Farsi stating "Pay into the Mahan account," concerning transfers (a) from Ascot General Trading to a named individual in the amount of €200,000, (b) to Flash Doviz for Mahan Air in the amount of €87,520, and (c) to Flash Doviz for Mahan Air in the amount of $50,000; and (2) Ascot General Trading Fund Transfer Request Forms concerning payments to Hong Kong Company-2 in the amount of $50,000 and to entities located in France and Germany for €27,520 and €60,000.

        y.   On or about July 23, 2015, CC-10 sent an email to an employee of Al Nafees Exchange with the subject: "Re: 100.000,00 USD MAHAN AIR" and attaching a wire transfer record reflecting a transfer in the amount of approximately $99,940.00 from Hanedan General Trading to Hong Kong Company-2 and identifying the intermediary bank for the transfer as U.S. Bank-4 in "New York, NY USA."

        z.   Later on July 23, 2015, CC-9 received an email from an employee of Al Nafees Exchange attaching an

18

electronic copy of the wire transfer record described in paragraph 16(y) above, with portions blacked out but reflecting, among other things, the originator, beneficiary, and intermediary bank (U.S. Bank-4) in "NEW YORK, NY USA."

aa.   On or about July 27, 2015, CC-10 sent an email to an employee of Al Nafees Exchange attaching an electronic copy of a Wire Transfer Send Money Receipt from a money services business in Dubai reflecting a wire transfer of $50,000 from Hanedan General Trading to Hong Kong Company-2.

bb.   On or about July 29, 2015, CC-10 sent an email to an employee of Al Nafees Exchange with the subject: "Re: 50.000,00 USD MAHAN AIR" and attaching a wire transfer record reflecting a transfer in the amount of approximately $49,950.00 from Hanedan General Trading to Hong Kong Company-2, and identifying the intermediary bank for the transfer as U.S. Bank-4 in "New York, NY USA."

(Title 18, United States Code, Section 371).

### COUNT TWO

### (Conspiracy to Violate the International Emergency Economic Powers Act)

The Grand Jury further charges:

17.   From at least in or about 2010, up to and including in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, REZA

ZARRAB, a/k/a "Riza Sarraf," MOHAMMAD ZARRAB, /k/a "Can Sarraf,"

a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy,"

and HOSSEIN NAJAFZADEH, the defendants, and others known and

unknown, knowingly and willfully did combine, conspire,

confederate, and agree together and with each other to violate,

and to cause a violation of, licenses, orders, regulations, and

prohibitions issued under the International Emergency Economic

Powers Act, Title 50, United States Code, Sections 1701 to 1707,

Part 560 of Title 31, Code of Federal Regulations, and Part 561

of Title 31, Code of Federal Regulations.

18.   It was a part and an object of the conspiracy

that REZA ZARRAB, a/k/a "Riza Sarraf," MOHAMMAD ZARRAB, a/k/a

"Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a

"Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and

others known and unknown, would and did export, reexport, sell,

and supply, and cause to be exported, reexported, sold, and

supplied, directly and indirectly, from the United States,

services, to wit, international financial transactions, to Iran

and to the Government of Iran, without first obtaining the

required approval of the Office of Foreign Assets Control,

within the United States Department of Treasury, in violation of

Title 50, United States Code, Sections 1701 to 1707, and Title

31, Code of Federal Regulations, Section 560.204.

19.   It was further a part and an object of the conspiracy that REZA ZARRAB, a/k/a "Riza Sarraf," MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, would and did engage in a transaction that evaded and avoided, had the purpose of evading and avoiding, caused a violation of, and attempted to violate one or more of the prohibitions set forth in Title 31, Code of Federal Regulations, Part 560, in violation of Title 50, United States Code, Sections 1701 to 1707, and Title 31, Code of Federal Regulations, Section 560.203.

### Overt Acts

20.   In furtherance of the conspiracy and to effect the illegal objects thereof, REZA ZARRAB, a/k/a "Riza Sarraf," MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, committed the overt acts set forth in paragraph 16 of this Indictment, among others, which are fully incorporated by reference herein.

(Title 50, United States Code, Section 1705;
Title 31, Code of Federal Regulations, Sections 560.203,
560.204, 560.205, 561.202, & 561.205.)

21

## COUNT THREE

### (Conspiracy to Commit Bank Fraud)

The Grand Jury further charges:

21. From at least in or about 2010, up to and including in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, REZA ZARRAB, a/k/a "Riza Sarraf," MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

22. It was a part and an object of the conspiracy that REZA ZARRAB, a/k/a "Riza Sarraf," MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, would and did knowingly execute and attempt to execute a scheme or artifice to defraud a financial institution, and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, by means of false and fraudulent pretenses, representations, and promises, in

22

violation of Title 18, United States Code, Section 1344.

### Overt Acts

23.   In furtherance of the conspiracy and to effect the illegal object thereof, REZA ZARRAB, a/k/a "Riza Sarraf," MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, committed the overt acts set forth in paragraph 16 of this Indictment, among others, which are fully incorporated by reference herein.

(Title 18, United States Code, Section 1349.)

### COUNT FOUR

### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

24.   From at least in or about 2010, up to and including in or about 2015, in the Southern District of New York, Turkey, the United Arab Emirates, and elsewhere, REZA ZARRAB, a/k/a "Riza Sarraf," MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and others known and unknown, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956(a)(2)(A).

23

25.   It was a part and an object of the conspiracy

that REZA ZARRAB, a/k/a "Riza Sarraf," MOHAMMAD ZARRAB, a/k/a

"Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a

"Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, and

others known and unknown, in an offense involving and affecting

interstate and foreign commerce, would and did transport,

transmit, and transfer, and attempt to transport, transmit, and

transfer, monetary instruments and funds to places in the United

States from and through places outside the United States, in

amounts exceeding $10,000, with the intent to promote the

carrying on of specified unlawful activity, to wit, the illegal

export of services to Iran as charged in Count Two of this

Indictment and bank fraud as charged in Count Three of this

Indictment, in violation of Section 1956(a)(2)(A) of Title 18,

United States Code.

### Overt Acts

26.   In furtherance of the conspiracy and to effect

the illegal object thereof, REZA ZARRAB, a/k/a "Riza Sarraf,"

MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA

JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the

defendants, and others known and unknown, committed the overt

acts set forth in paragraph 16 of this Indictment, among others,

24

which are fully incorporated by reference herein.

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATION

### (Counts Two and Three)

27.   As a result of committing the offenses alleged in Counts Two and Three of this Indictment, REZA ZARRAB, a/k/a "Riza Sarraf," MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a "Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and HOSSEIN NAJAFZADEH, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts Two and Three of this Indictment, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the offenses.

### Substitute Assets Provision

28.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        a)    cannot be located upon the exercise of due diligence;

        b)    has been transferred or sold to, or deposited with, a third person;

        c)    has been placed beyond the jurisdiction of the court;

d)   has been substantially diminished in value;
     or

e)   has been commingled with other property
     which cannot be subdivided without
     difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendants up to the value of the above

forfeitable property.

## FORFEITURE ALLEGATION

### (Count Four)

29.   As a result of committing the money laundering

offense alleged in Count Four of this Indictment, REZA ZARRAB,

a/k/a "Riza Sarraf," MOHAMMAD ZARRAB, a/k/a "Can Sarraf," a/k/a

"Kartalmsd," CAMELIA JAMSHIDY, a/k/a "Kamelia Jamshidy," and

HOSSEIN NAJAFZADEH, the defendants, shall forfeit to the United

States, pursuant to Title 18, United States Code, Section 982,

all property, real and personal, involved in the money

laundering offense and all property traceable to such property,

including but not limited to, a sum of money representing the

amount of property that was involved in the money laundering

offense or is traceable to such property.

26

## Substitute Assets Provision

30.  If any of the above-described forfeitable

property, as a result of any act or omission of the defendants:

- a)  cannot be located upon the exercise of due diligence;

- b)  has been transferred or sold to, or deposited with, a third person;

- c)  has been placed beyond the jurisdiction of the court;

- d)  has been substantially diminished in value; or

- e)  has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendants up to the value of the above

forfeitable property.

(Title 18, United States Code, Sections 981, 982;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

Foreperson

_____
PREET BHARARA
United States Attorney

27

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

REZA ZARRAB, a/k/a "Riza Sarraf,"
MOHAMMAD ZARRAB, a/k/a "Can Sarraf,"
a/k/a "Kartalmsd,"
CAMELIA JAMSHIDY, a/k/a "Kamelia
Jamshidy," and
HOSSEIN NAJAFZADEH,

Defendants.

SUPERSEDING INDICTMENT

S2 15 Cr. 867 (RMB)

(18 U.S.C. § 371; 50 U.S.C. § 1705; 31
C.F.R. §§ 560.203, 560.205; 18 U.S.C.
§§ 1349, & 1956.)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

11/7/16   Filed superseding indictment
j-dye Netburn